## KRINSKY v. CARNIE INVESTMENTS, INC., etc., et al.

Case No. 80-3103 CA (L) 01 G

Fifteenth Judicial Circuit, Palm Beach County

October 22, 1984

### APPEARANCES OF COUNSEL

**Harold G. Melville, Neill, Griffin, Jeffries & Lloyd,** for plaintiff.

**Jeffrey Deutsch** for defendant, Donald F. Guy.

### OPINION OF THE COURT

THOMAS E. SHOLTS, Circuit Judge.

### PLAINTIFF'S POST-TRIAL MEMORANDUM

### *RELEVANT FACTS*

This case was tried by this Court on a non-jury basis on July 17, 1984. The Plaintiff, Jay Krinsky, Trustee ("Krinsky"), is the substitute trustee appointed by this Court on November 12, 1980 to hold legal title to two (2) mortgages for the benefit of all of the participants in

those mortgages. These two mortgages are: (1) the mortgage given by Lake Boca Villas, Inc. to Carnie Investments, Inc., Trustee dated January 20, 1978 in the original principal sum of Two Hundred and Seventy Five Thousand Dollars ($275,000) and recorded on January 23, 1978 in Official Records Book 2799 at Page 1165 et seq. of the Public Records of Palm Beach County, Florida (the "Lake Boca Villas Mortgage"); and, (2) the mortgage given by Florcar, Inc. to Argosy Management Company, Ltd. dated February 7, 1979 in the original principal sum of One Million Five Hundred Thousand Dollars ($1,500,000) and recorded on October 18, 1979 in Official Records Book 3157 at page 271 et seq. of the Public Records of Palm Beach County, Florida (the "Seven Springs Mortgage").

The remaining Defendants in this case are J. David Carnie ("Carnie"), R. James Saunders ("Saunders") and Donald F. Guy ("Guy"). Carnie and Saunders defaulted in this case by failing to appear after being served and a default as to liability was entered against them. Although they were both given actual notice of the trial date, they failed to appear at trial. Accordingly, this Court has already directed that Judgment be entered against them for the amount of damages proven at trial.

Guy appeared at trial and contested liability as well as damages.

According to the testimony of Guy at trial, he was the President of the three (3) Florida corporations, Carnie Investments, Inc. ("Carnie Investments"), Florcar, Inc. ("Florcar"), and Suncar Holdings, Inc. ("Suncar"), during the time of the actions complained of herein. Guy also admitted to being a director of Argosy Financial Group of Canada Limited, London Loan Limited and the managing director of the Netherlands Antilles Corporations, Sucassa, N.V. and Roland, N.V. According to Guy's testimony, Sucassa, N.V. was owned by Saunders and Roland, N.V. was owned by Carnie.

The evidence at trial showed that the Argosy Financial Group based in Canada had obtained substantial funds from a wide variety of investors who purchased participation interests in various mortgages being syndicated by Argosy. In regard to its Florida operations, Argosy sold participation interests in both the Seven Springs and the Lake Boca Villas Mortgages. The funds were forwarded by Argosy in Canada to Carnie Investments in Florida and Guy was provided with information showing the name of each specific participant, the date of their participation investment, the amount of their participation investment and indicating in which specific mortgage that investor had purchased the participation interest.

Guy admitted at trial that he clearly understood that Carnie Investments was holding title to the Lake Boca Villas Mortgage on behalf of and for the benefit of the participants therein and identified at trial a list which he had directed the corporate bookkeeper to prepare from the records of Carnie Investments, while he was President, showing the name of each participant, the amount paid by each participant and the date of the investment. Guy had this list prepared for use during his deposition taken on October 23, 1980 and the list was an exhibit to that deposition. Thus, Guy knew that the corporation of which he was president, Carnie Investments, held title to the Lake Boca Villas Mortgage as a Trustee for and on behalf of those individuals who had bought participation interests in that mortgage, all as shown by his own corporate records.

The amounts paid in by each participant in the Lake Boca Villas Mortgage was confirmed by the investigative accountant from the Ontario Securities Commission, Larry Waite, who, himself, had reviewed the corporate records of Carnie Investments and Argosy and who confirmed that Guy's own accounting as to who had bought participation interests in that mortgage and their respective amounts was accurate.

The Lake Boca Villas Mortgage, after its subordination to a larger mortgage from Gulfstream Bank, was a second mortgage on a seven unit townhouse project located in Boca Raton, Florida. In the subordination agreement, Lake Boca Villas, Inc. and Carnie agreed to certain specific release prices for each of the seven units from the Lake Boca Villas Mortgage.

In December of 1979, Lake Boca Villas, Inc. desired to sell Units No. 3, 4, 5 and 6 of the project. According to the specific release schedule, the release price for these four (4) units under the Lake Boca Villas Mortgage totalled One Hundred and Forty One Thousand Dollars ($141,000). Guy acknowledged this at trial.

Since Lake Boca Villas, Inc. did not have sufficient funds coming out of the sale of these four units to pay the release price of $141,000 to Carnie Investments, Guy, as President of Carnie Investments, agreed not to take any cash, but rather to allow this $141,000 to be credited towards the purchase of Unit No. 3 by Suncar. (Suncar was owned one-half by Carnie and one-half by Saunders and the total purchase price for this unit was approximately One Hundred and Seventy Thousand ($170,000) Dollars).

Both at his deposition in 1980 and at trial, Guy acknowledged that after the purchase of Unit No. 3 by Suncar, he was aware that the

124

participants' $141,000 of principle released from the mortgage was then represented by the legal title in Unit No. 3 and that he, as President of Suncar, was holding that Unit for the benefit of the participants in the Lake Boca Villas Mortgage, since it was their money which had been used to buy that Unit.

By way of personal involvement, it should be noted that Guy personally signed the Satisfaction of Mortgage for Units No. 3, 4, 5 and 6 under the Lake Boca Villas Mortgage, that he signed the closing statement for the purchase of Unit No. 3 by Suncar, that he signed the Purchase and Sale Agreement for Unit No. 3 and that he was very much personally involved in this transaction.

Following the purchase of Unit No. 3 by Suncar in December of 1979, Guy then mortgaged Unit No. 3 which had been held free and clear, to the Royal Trust Bank of Palm Beach, N.A. on February 19, 1980 for the sum of One Hundred and Fifty Thousand Dollars ($150,000). Guy signed, as President of Suncar, the Promissory Note in this amount, the Mortgage on Unit No. 3, the Borrower's Affidavit and other related documents. Guy then testified that instead of repaying to the participants in the Lake Boca Villas Mortgage, the monies owned, he transferred all of these funds to Florcar, a corporation of which he was also president.

Florcar, was the owner and developer of the Seven Springs Project, and Guy testified that he transferred these funds from Suncar to Florcar, because the bank which had been funding The Seven Springs Project failed to honor its commitment to fund the full amount of various mortgages, that Florcar was desperately in need of cash and that it had no other source of funds. He further testified that Florcar used this money to pay salaries, operating expenses and other develop-ment expenses in regard to the Seven Springs Project. There was no evidence offered that any of the monies transferred from Suncar to Florcar in this fashion were ever repaid or that any of the principle funds owed to the participants in the Lake Boca Villas Mortgage were ever repaid following this transfer.

Although questioned extensively on this issue, Guy was unable, to recall what, if any, thought he gave to the position of the participants in the Lake Boca Villas Mortgage, at the time he transferred the $150,000 from Suncar to Florcar.

In March of 1980, the Argosy empire in Canada collapsed, the various Argosy companies were put into receivership, Carnie and Saunders were charged with various criminal frauds regarding the mortgage scheme and Twenty Million Dollars ($20,000,000) or more of

participants' money was lost. Saunders ultimately plead guilty to various criminal charges and is currently in prison in Canada. Carnie is scheduled for trial in October.

Following the appointment of Krinsky as the substitute trustee in November of 1980, he sought and finally obtained title to Unit No. 3 in July of 1981 of Lake Boca Villas from the Suncar Bankruptcy Trustee. Krinsky then made efforts to sell that Unit so as to realize whatever equity might be therein. Despite diligent efforts to sell the property, Krinsky was unable to conclude a sale until the Fall of 1982. Due to a severly depressed real estate market and the accumulated interest charges, unpaid taxes, condominium assessments, repair costs, etc. no funds were realized from the sale of Unit No. 3 for the benefit of any of the participants in the Lake Boca Villas Mortgage.

Although Krinsky was able to collect from the various bankruptcy and other Court proceedings a net of approximately Sixty Thousand Dollars ($60,000) for the benefit of the Lake Boca Villas Mortgage paticipants, those funds were realized solely from the unreleased units, being Units No. 1, 2 and 7 and he derived absolutely no benefit from Units No. 3, 4, 5 and 6 which had been released previously by Guy.

According to both the accounting summary prepared by Guy from the corporate records of Carnie Investments in October of 1980 and the analysis of Larry Waite, the principle sum owed to the participants in the Lake Boca Villas Mortgage is Two Hundred Thirty Five Thousand Two Hundred Ninety One Dollars and ninety-eight cents ($235,291.98) and the accrued interest through June 11, 1984 totalled One Hundred Thirty Seven Thousand Four Hundred Twenty Five Dollars and eighty-eight cents ($137,425.88). Thus, the total owed as of June 11, 1984 to the participants in the Lake Boca Villas Mortgage was Three Hundred Seventy Two Thousand Seven Hundred and Seven Dollars and eighty-two cents ($372,707.82).

Also according to the testimony of Waite, the total principle and accrued interest owed to the participants in the Seven Springs Mortgage as of June 11, 1984 was Two Million Four Hundred Fifty Thousand One Hundred Ninety Eight Dollars and seventy-one cents ($2,450,198.71).

## *POINT ONE*

AN OFFICER OF A CORPORATE TRUSTEE WHO KNOWINGLY PARTICIPATES IN A BREACH OF THE TRUST IF PERSONALLY LIABLE TO THE BENEFICIARIES FOR ANY LOSS INCURRED

Although research reveals no Florida cases specifically on point, this issue has been raised on numerous occasions in other states and is best summarized by reference to one of the recognized treatises in the area.

> Any officer who knowingly causes the corporation to commit a breach of trust causing loss to a trust administered by the corporation is personally liable for the loss to the beneficiaries of the trust. It is no defense in an action brought against the officer by the beneficiaries of the trust or by a successor trustee that he did not himself profit through the breach of trust or that his conduct was not dishonest. *Scott on Trusts* Section 326.3 at pages 2362-2363.

Simply put, since the corporation can only act through its officers or directors, if an officer through his actions knowingly causes the corporation to commit a breach of the trust, he will be held personally liable. To rule otherwise, would allow an individual to form a corporation to act as trustee and then be able to disregard any of the normal obligations of a reasonable prudent trustee.

> Where the director or officer causes the breach of trust he is personally liable to the beneficiaries for the loss resulting from the breach of trust if he is guilty of negligence in so doing. In such a case he violates the duty not merely to the corporation but to the beneficiaries of the trust. *Scott on Trusts*, Section 326.3 at page 2364.

That the officers of a corporate trustee can be held personally liable to the beneficiaries for knowingly participating in a breach of the trust, even though they act in good faith and receive no personal gain from the transaction, is demonstrated by a variety of cases. These include: *Strauss v. United States Fidelity & Guarantee Co.,* 623 F.2d 174 (4th Cir. 1933), wherein the directors knowingly permitted the trust company to co-mingle trust funds with its corporate deposits; *Ark-Tenn Distributing Corp. v. Breidt,* 209 F.2d 359 (3rd Cir. 1954) wherein the corporate treasurer co-mingled the trust funds with other assets of the company; *Shuster v. North American Mortgage Loan Co.,* 40 N.E. 2d 130 (S.Ct. Ohio 1942), wherein the corporate directors reinvested the trust assets without authority, even though they acted in good faith to benefit the trust beneficiaries and derived no personal gain from the transaction; *Masonic Building Corporation v. Carlsen,* 258 N.W. 44 (S.Ct. Neb. 1934), wherein the corporate officers used trust funds to make an unauthorized investment; *Rose v. Bernhardt,* 153 A.609 (N.J. 1931), wherein the corporate president and treasurer breached the trust by making unauthorized distribution of funds, even though those individuals did not receive any of the money or personally benefit from the transaction; *Anderson v. Daley,* 56 N.Y.S. 522 (S.Ct. App.Div.

**127**

1899), wherein there was no fraud on the part of the corporate officer, but he wrongfully used trust funds for corporate purposes; and *Rubin v. Freeman Electric Construction Co., Inc.*, 185 N.Y.S.2d 647 (S.Ct. App.Div. N.Y.1959), wherein the corporate secretary knowingly received a loan of trust funds, although he knew the corporation was insolvent.

As can be seen from the foregoing discussion, when an officer of a corporate trustee "knowingly" participates in a breach of trust, he can be held personally liable. In this case, Guy, as president of Carnie Investments, Florcar and Suncar, took all of the actions with full knowledge of what he was doing. He was aware at the time of the events that Carnie Investments held title to the Lake Boca Villas Mortgage as a trustee for the benefit of the participants, he was aware that after having satisfied the Mortgage and Note with regard to Units No. 3, 4, 5 and 6 that those trust funds were then represented by title in Unit No. 3 and he was further aware that he was transferring or causing to be transferred the $150,000 proceeds from the Royal Trust Loan to Florcar. Accordingly, his actions were taken "knowingly" and he certainly participated in these actions, since he is the corporate officer who executed all of the documents in connection with these specific transactions.

## POINT TWO

THE OFFICER OF A CORPORATE TRUSTEE IS HELD TO THE SAME STANDARD OF CARE REQUIRED TO BE EXERCISED BY ANY OTHER TRUSTEE WHEN HE DEALS WITH TRUST FUNDS

As with the obligation of the corporate trustee itself, the test applied to the actions of the corporate officer is whether or not the officer violated his obligation to act on behalf of the beneficiaries in a reasonably prudent manner.

> (the officer) is under a duty to the beneficiaries to use reasonable care in the exercise of his powers and the performance of his duties as such director or officer. *Scott on Trusts*, Section 326.3 at page 2364.

Thus, to be held personally liable for a breach of the trusts, the corporate officer does not have to be guilty of fraud, or other ill-motive. Rather, he is held to the same standard of reasonably prudent care required of any other trustee and he cannot raise as a defense the fact that he acted in good faith for the benefit of the beneficiaries or that he did not receive any personal gain from the transaction. Cases

128

supporting this principle include: *Schuster v. North American Mortgage Loan Co., supra; Strauss v. United States Fidelity & Guarantee Co., supra; Rose v. Bernhardt, supra; Anderson v. Daley, supra.* Other cases involving the personal liability of officers and directors for negligent or imprudent management include: *Minnis v. Sharpe*, 151 S.E. 735 (N.C. 1930), wherein the officers and directors negligently delegated the entire management of the trust funds to one officer who then converted the funds himself; *Finley v. Exchange Trust Co.*, 80 P.2d 296 (Oklahoma 1938), wherein the directors negligently authorized improper investments; *Peruvian Guano Corp. v. Thompson*, 99 S.E. 808 (S.C. 1919), wherein the officers negligently permitted misappropriation of trust funds; and *First Trust Company of Lincoln v. Carlsen*, 261 N.W. 333 (Nebraska 1935), wherein the officers and directors who were members of the executive and loan committees negligently permitted concealment from the bond holders of various defaults on the bonds.

As with the normal standard of care required by a trustee, it is no defense that the officer of the corporate trustee did not benefit from the transaction himself or that he acted in good faith. *The Law of Trust and Trustees* 2d Edition 1982 Section 901; *Scott on Trusts*, Section 326.3.

> In order that the (officer) be liable as a participant, it is not necessary to show that he benefitted as a result of the transaction. *The Law of Trusts and Trustees*, Section 902 at page 260.

> It is well settled that every violation by a trustee of a duty which equity lays upon him, whether willfully fraudulent or done through negligence or arising through mere oversight or forgetfulness is a breach of trust. . . . Any officer who knowingly causes the corporation to commit a breach of trust causing loss to a trust administered by the corporation is personally liable for the loss to the beneficiaries of the trust. *Schuster v. North American Mortgage Loan Co.*, at 143.

Where the directors of a trust company who knowingly, but without bad faith or malice and without any personal benefit co-mingled the trust funds with commercial deposits in violation of the trust, they were held personally liable to the beneficiaries for the loss sustained. *Strauss v. United States Fidelity & Guarantee Co., supra.*

In all of the foregoing cases, the common thread is that the corporate officer or director is held personally accountable and liable to the beneficiaries of the trust if that officer knowingly aided the corporation or participated in the breach of trust, even assuming that

**129**

the breach was innocent, without fraud, and that the officer or director received no personal gain therefrom. Thus, whenever an officer of a corporate trustee deals with the trust funds, he will be held to the same standard of care as any other trustee of those funds under similar circumstances.

It is without question that in Florida a trustee will be held personally liable to the beneficiaries if he fails to exercise the care and skill of a prudent man in the protection of the trust assets. *Hoppe v. Hoppe*, 377 So.2d 374 (Fla. 4th DCA 1978). Likewise, the *controlling duty* of the trustee is the faithful and efficient *conservation* of the trust. *Traub v. Traub*, 135 So.2d 243 (Fla 2d DCA 1961). Indeed, the concept that a trustee must act in good faith for the benefit of the beneficiaries is a concept strongly supported by the Florida courts.

> Many forms of conduct permissible in a work day world for those acting at arms length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honestly alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. . . . Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this Court. *Bush v. Palmerro Realty, Inc.*, 443 So.2d 104, 106 (Fla. 4th DCA 1983).

Furthermore, not only must the trustee exercise his fiduciary judgment in a prudent manner, but he is bound to return to the beneficiaries the assets of the trust once the object of that trust has been completed.

> A fiduciary, be he an attorney or not, must account for and deliver over property or money of a beneficiary or client which has been entrusted for a specific purpose. *Amsler v. American Home Assurance Co.*, 348 So.2d 68, 71 (Fla. 4th DCA 1977).

Bearing these principles in mind, as soon as Guy was in a position to return to the beneficiaries the $141,000 from the proceeds of the Royal Trust Loan on Unit No. 3 of Lake Boca Villas, he was clearly obligated to do so. The "object" of the trust—i.e. an investment in a specific mortgage—had been partially completed by the release and satisfaction of the majority of that mortgage and the underlying debt. Guy had no authority to "reinvest" the money elsewhere by transferring of those funds to Florcar, a corporation of which he was also the president, for the purpose of preventing that corporation's imminent financial disaster, which disaster ultimately ensued. This transfer of

130

funds could in no way be conceivably termed a prudent act or the faithful and efficient "conservation" of the trust property. Accordingly, Guy breached his obligation as trustee by: (1) not immediately returning the funds to the beneficiaries which he had the *absolute obligation* to do since the objection of the trust had been accomplished with regard to those funds; (2) co-mingling the trust funds with other corporate funds of a sister corporation of which he also was president and; (3) even assuming that he had the authority to reinvest the funds and even if the funds were not co-mingled with those of Florcar, and characterizing the actions as a "loan" to Florcar such actions by the trustee would be grossly imprudent, considering the circumstances of the transfer and the controlling duty of an efficient conservation of the trust assets.[1]

Thus, based upon the facts proven at trial and the controlling law, Guy is personally liable to the participants in the Lake Boca Villas Mortgage for the sum of $141,000 together with pre-judgment interest thereon at the rate of 12% (the rate set out in the participation agreements and the Carnie Investment records) from February 19, 1980, the date upon which the Royal Trust Loan was funded and Guy was in a position to return those funds.

### POINT THREE

### KRINSKY AS SUBSTITUTE TRUSTEE IS ENTITLED TO RECOVER ON BEHALF OF ALL PARTICIPANTS IN THE LAKE BOCA VILLAS MORTGAGE

At the time of their respective investments, each participant in the Lake Boca Villas Mortgage bought a specific participation interest in that mortgage to the extent of the dollar amount of their investment. For example, Montreal Trust bought five (5) separate participation interests in the Lake Boca Villas Mortgage on the following dates and in the following amounts:

March 10, 1978—$20,000.00

March 31, 1978—$35,000.00

April 27, 1978—$12,000.00

December 29, 1978—$30,000.00

February 7, 1980—$5,000.00

---

[1] Characterizing the transfer from Suncar to Florcar as a "loan" puts the facts in the light most *favorable* to Guy, since he offered no evidence of any note or loan documents and since there was no testimony regarding the obligation to return those funds. An equally valid characterization of the transaction would be a simple conversion of the trust funds with no actual intent to return them at a later date.

131

The other participants, the dates of their participation investment, and the dollar amount of each participation investment are all shown on the accounting summary which Guy directed the bookkeeper for Carnie Investments to prepare from the Carnie Investments books and records and which summary he produced during his deposition taken in October of 1980. The individuals and the amounts on this list, for the Lake Boca Villas Mortgage, were confirmed by Larry Waite through his own independent review of the Carnie Investment books and records.

According to both Guy and Waite, the total amount of principle owed to the participants in the Lake Boca Villas Mortgage is Two Hundred Thirty Five Thousand Two Hundred Ninety One Dollars and ninety-eight cents ($235,291.98). Guy testified that as of the time he resigned from Carnie Investments there had been no repayments of principal to reduce this amount, and Waite testified that his review of the books and records of Carnie Investments showed no such repayments. Thus, the total sum owed to all of the participants in the Lake Boca Villas Mortgage is unequivocally that principal sum of $235,291.98 and the interest accruing thereon which amounts to $137,425.88 through June 11, 1984 for a total of $372,717.82 due to the participants in that mortgage.

For some unknown reason, counsel for Guy argues that each individual participant would have to be identified at trial, his individual participation agreement offered in evidence and testimony offered from each participant that he has not been repaid. This is simply not so and is merely another attempt to defend the case, not on its real issues, but on some non-existent technical objection.

Krinsky, as the Court appointed substitute trustee, is entitled to recover for the benefit of his beneficiaries whatever part of the trust property has been misappropriated or lost through a breach of the trust. Clearly under Fla.R.Civ.P. 1.210, a trustee can bring an action for the benefit of the trust without joining the beneficiaries for whose benefit the action is brought. All that is required, is for Krinsky to prove that Guy as a corporate officer of Carnie Investments, Inc. knowingly participated in a breach of the trust and that the beneficiaries have suffered as a result thereof. For the purposes of this action, it is not necessary that Krinsky even identify all of the various parties to the trust or when they made their investment or what the amount of their specific investment is. That is a matter to be resolved, in the event of a dispute, between Krinsky, the beneficiaries and the Court.

132

Thus, Guy, if he has wrongfully breached the trust and caused the beneficiaries to be injured cannot defend the case by saying that Krinsky didn't prove which beneficiary or participant made what investment on which date. That is truly irrelevant to the issues presented against Guy.

In point of fact, the evidence at trial irrefutably shows that Guy, as the president of the corporate trustee, breached the trust by failing to promptly refund the trust assets when the trust purpose had been accomplished, by co-mingling the funds and by making grossly imprudent decisions, thus causing the beneficiaries of the trust to lose the principal sum of $141,000 and that these actions were taken on or about February 19, 1980. That was all Krinsky was required to prove and he did that. He also did more, however, and proved through the use of Guy's own list of participants the names, dates and amounts of each participant in the mortgage. Krinsky further proved through Guy and Waite that these amounts were never repaid.

While Montreal Trust offered into evidence all of its own participation agreements, the fact that an individual may or may not have a participation agreement is irrelevant to the cause of the action sued upon herein. The undisputed evidence is that these individuals gave money to purchase an interest in the mortgage, that Guy knew about it, that Guy had a list of the people and the amounts involved, that Guy knew he was holding the mortgage on behalf and for the benefit of these people and that Guy abused the trust relationship.

Krinsky has proven even more than was required to sustain the claim against Guy.

## CONCLUSION

Based upon the evidence presented at trial and the legal arguments set forth herein, it is respectfully urged that this Court find as a matter of fact that Guy in his capacity as president of Carnie Investments, Inc. breached the trust relationship by failing to return to the beneficiaries the trust funds when the object of the trust had been accomplished by co-mingling the trust funds with the funds of Suncar' and Florcar and by making a grossly imprudent transfer of the trust funds to a corporation, also controlled by Guy, which corporation was then in the throes of financial disaster and which ultimately went bankrupt. Accordingly, the Plaintiff, Jay Krinsky, Trustee, urges this Court to enter Judgment in his favor and against Donald F. Guy fo the exact sum of One Hundred and Forty One Thousand Dollars ($141,000), that being the amount of principal misappropriated, together with

**133**

interest thereon at the rate of 12% per annum, that being the interest rate set forth in the various participation agreements and as shown by the books and records of Carnie Investments, Inc. from the date of the breach of trust which was February 19, 1980 through the date of the trial.

## FINAL JUDGMENT AGAINST DONALD F. GUY

This cause coming on for trial by the Court on a non-jury basis on July 17, 1984 and this Court having heard the testimony of the witnesses and having reviewed the documents submitted into evidence and this Court finding that Donald F. Guy in his capacity as president of Carnie Investments, Inc. did knowingly participate in that breach of fiduciary duty existing between Carnie Investments, Inc., and himself as the president of Carnie Investments, Inc. with the participants in that certain mortgage given by Lake Boca Villas, Inc. to Carnie Investments, Inc., Trustee in the original principal sum of Two Hundred Seventy Five Thousand Dollars ($275,000.00) which mortgage was recorded on January 23, 1978 in Official Records Book 2799 at page 1165 et seq. of the Public Records of Palm Beach County, Forida (the "Lake Boca Villas Mortgage") it is hereby

ORDERED AND ADJUDGED that

1. Final Judgment is hereby entered in favor of Jay Krinsky, Trustee, the substitute trustee appointed by this Court on November 12, 1980 to hold legal title to said Lake Boca Villas Mortgage for the benefit of all participants therein and against Donald F. Guy for the sum of One Hundred Forty One Thousand Dollars ($141,000.00) together with pre-judgment interest thereon at the rate of 12% from February 19, 1980 through the date of trial in the amount of Seventy Four Thousand Seven Hundred and Thirty Dollars ($74,730.00).

2. This Court reserves jurisdiction to tax costs in this matter should a motion to tax costs be filed.